UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| BRIAN EDDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: _____ |
| | ) | |
| DOMINION ENERGY, INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Brian Eddy, by counsel, submits the following Complaint against Defendant Dominion Energy, Inc. for violations of the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C.A § 12101, *et seq.*

### PARTIES

1. Plaintiff Brian Eddy ("Mr. Eddy") is an individual domiciled in Virginia. Mr. Eddy is a "person" and "employee" within the meaning of the Americans with Disabilities Act, as amended (ADA), 42 U.S.C.A. §§ 12111(4), (7).

2. Defendant Dominion Energy, Inc. ("Dominion") is a Virginia corporation with headquarters located in Richmond, Virginia. Dominion is an "employer" and "covered entity" within the meaning of the ADA, 42 U.S.C.A. §§ 12111(2), (5).

### JURISDICTION AND VENUE

3. This is an action alleging the following claims: (1) Failure to Accommodate in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C.A. § 12112(5)(A); (2) Disparate Treatment in violation of the ADA, 42 U.S.C.A. § 12112(a); and (3) Wrongful Termination in violation of the ADA, 42 U.S.C.A. § 12112(a).

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Mr. Eddy's claims arise under the ADA, which is a federal law.

5. This Court has personal jurisdiction over Dominion because Dominion is incorporated in Virginia and maintains its principal place of business in Virginia.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this judicial district. Furthermore, Dominion has substantial and deliberate contacts with this judicial district.

7. On August 31, 2020, Mr. Eddy received a Dismissal and Notice of Rights regarding the claims asserted in this Complaint from the Equal Employment Opportunity Commission (EEOC Charge No. 437-2020-00326).

FACTS

Mr. Eddy's Employment & Attendance Records.

8. Mr. Eddy is a forty-two (42) year-old male and a former employee of Dominion. He began working for Dominion on or around November 23, 1999 in the position of Groundsman. He was later promoted to Lineman. Mr. Eddy's most recent position with Dominion was Electric Serviceman, 1st Class, which is the position he held at the time of his termination. In total, Mr. Eddy's employment tenure with Dominion spanned nearly twenty years.

9. In 2015, Mr. Eddy became aware of certain blockages in his arteries. He underwent triple bypass surgery in April 2015 to remove these obstructions. Mr. Eddy took FMLA leave intermittently until September 2015 to recover from the procedure.

10. In September 2015, after recovering from his triple bypass surgery, Mr. Eddy's physician released him to return to work. Mr. Eddy then informed his first line supervisor, David

Barhanm, and his manager, Tommy Curran, that he had been cleared to return. In response, Mr. Curran asked Mr. Eddy to execute a medical release so that Dominion could speak to Mr. Eddy's physician, which Mr. Eddy promptly did. Mr. Eddy's physician provided Dominion the requested information, and Mr. Eddy returned to work in October 2015.

11. After he returned to work in October 2015, Mr. Eddy continued to experience medical issues related to his cardiac blockage and subsequent surgery, including severe aches and pains, extreme nausea, fits of vomiting, headaches, and chest pains. Mr. Eddy continued to experience these symptoms at various times, and with varying degrees of severity, up until his termination of employment.

12. On a number of occasions between October 2015 and February 2018, Mr. Eddy's medical issues prevented him from returning to work. Mr. Eddy requested both continuous and intermittent FMLA leave several times to account for these absences. Dominion approved some of these requests and denied others.

13. On June 27, 2017, as a consequence of certain of these denials, Mr. Eddy's received a "Written Notice" for alleged "absenteeism" from his then-supervisor, Warren Cutting. Mr. Eddy received a "Final Written Notice" alleging the same thing on February 19, 2018. That same day, Mr. Eddy received an "Employment Decision Day," which is Dominion parlance for corrective action.

14. On February 23, 2018, Mr. Eddy filed a grievance with his union alleging that he was unjustly subjected to an "Decision Day." In this grievance, Mr. Eddy disputed Dominion's tallying of his "unexcused" absences on the grounds that Dominion had relied upon inaccurate attendance records maintained by its third-party FMLA administrator, Unum Group ("Unum").

15. On February 27, 2018, Mr. Eddy received a "Final Notice Action Plan

Questionnaire" ("Questionnaire") related to his alleged absenteeism. Upon information and belief, the Questionnaire also relied upon attendance records maintained by Unum.

16. Upon information and belief, certain of Unum's attendance records were inaccurate. Mr. Eddy, for example, identified certain medical absences that he believed attributable to a different Dominion employee. This conclusion was bolstered when Mr. Eddy later discovered that his "hard file" contained FMLA certification documents of a different employee. Consequently, upon information and belief, Dominion's recording of Mr. Eddy's "unexcused" absences was inaccurate.

17. In March 2018, Mr. Eddy submitted a written complaint to Dominion Human Resources regarding his belief that Dominion's accounting of his "unexcused" absences was based on inaccurate attendance information maintained and provided by Unum. Mr. Eddy repeatedly tried to get ahold of a Human Resources professional to address these issues. Mr. Eddy also tried to speak with his manager, Mr. Curran, about these issues, but Mr. Curran was dismissive and would not address Mr. Eddy's concerns.

18. About a month after Mr. Eddy first tried to contact Human Resources to address the Unum attendance records, he was finally able to speak with Anthony Sofia, Human Resources Manager, who told Mr. Eddy that another employee named Elizabeth McNair would respond to his concerns. Mr. Eddy spoke to Ms. McNair and arranged a date and time to meet with her regarding the discrepancies he had identified.

19. On April 16, 2018, Mr. Eddy traveled to Dominion's Richmond headquarters to meet with Ms. McNair and another Human Resources professional named Norma Campbell regarding his attendance records. During this meeting, Mr. Eddy presented his attendance records to Ms. McNair and Ms. Campbell, and showed them examples of the inaccurately recorded

information he had identified.

20. Despite traveling from Chesapeake to Richmond for the sole purpose of meeting with Ms. McNair and Ms. Campbell, Mr. Eddy did not receive any correspondence regarding his attendance records until over two months later, in July 2018, when he participated in a conference call that included Mr. Curran, Ms. McNair, Ms. Campbell, Warren Cutting, Stephanie Cox, and Marlin Patrick.  Among other things, Mr. Eddy informed those on the call that he had discovered another employee's FMLA paperwork in his personnel file.  After the call concluded, Mr. Eddy heard nothing further regarding the issues he had identified.

21. Upon information and belief, Dominion never corrected Mr. Eddy's attendance records to account for the discrepancies he had identified.

<u>Mr. Eddy's Requests for Accommodation & CDL Medical Certification</u>.

22. As an Electric Serviceman, 1st Class, Mr. Eddy's primary duties included: (1) responding to power outages; (2) the repair and maintenance of both overhead and underground electrical distribution lines; and (3) responding to storm restoration events.  Mr. Eddy was also required to understand industrial electrical distribution systems, maintenance techniques for industrial electrical distribution systems, and switching practices related to electrical distribution.

23. In Mr. Eddy's position as Electric Serviceman, 1st Class, he was required to work mandatory overtime and a rotating schedule, which often meant working ten or days in a row without a day off.

24. On or around January 19, 2019, Mr. Eddy called Norma Campbell, Human Resources, and informed her that he had been experiencing aches, chest pains, nausea, and other symptoms as a result of his triple bypass and congestive heart failure.  Mr. Eddy asked Ms. Campbell about potential accommodations that would alleviate these symptoms and permit him to

continue performing the essential functions of his position.

25. Upon information and belief, after their initial conversation, Mr. Eddy received no further communication from Ms. Campbell about potential accommodations, and such accommodations were neither offered nor provided.

26. In his position as Electric Serviceman, 1st Class, Mr. Eddy was required to obtain, and did obtain, a valid class A Commercial Driver's License (CDL).

27. CDL drivers are required to maintain a valid medical exam certificate ("MEC") in order to operate commercial vehicles. In order to obtain an MEC, a medical examiner must determine that the driver is physically qualified to drive a commercial motor vehicle under the applicable physical qualification standards, which are established by the United States Department of Transportation ("DOT"). Because Mr. Eddy had an underlying heart condition, his MEC was subject to an annual medical certification requirement. A compliance officer from Dominion was tasked with monitoring both the status of Mr. Eddy's medical certification and any upcoming certification deadlines.

28. In January 2019, Mr. Eddy misplaced the physical copy of his CDL. Mr. Eddy informed his line supervisor, Brian Bell, of this, and was instructed to obtain a replacement from the Department of Motor Vehicles (DMV). Mr. Eddy was then suspended from work, without pay, pending a reissued and valid CDL.

29. As instructed, Mr. Eddy sought a replacement CDL from the Virginia DMV. Mr. Eddy was initially told that his CDL could not be reinstated because of an issue with a duplicate CDL issued in North Carolina, even though he did not maintain a CDL in North Carolina. After some back-and-forth with the Virginia DMV and the North Carolina DMV, Mr. Eddy resolved the confusion about the duplicate CDL, and obtained a letter from the Virginia DMV stating that there

were no issues with his driving privileges in the Commonwealth.

30. On January 28, 2019, a Dominion compliance officer named Jonathan Brinn presented Mr. Eddy with the paperwork for his annual medical certification, even though the deadline for Mr. Eddy to obtain the proper medical testing and documentation was just three days later, January 31, 2019.

31. On February 11, 2019, Mr. Eddy went to Taylor Made Diagnostics, an occupational health services provider, to obtain his MEC. Given his poor cardiac health and triple bypass surgery, Mr. Eddy received a "Deferred DOT Medical Examine Certificate" stating that additional testing and information was needed from his cardiologist. Specifically, the certificate stated that Mr. Eddy's MEC was being deferred because of his "triple bypass [surgery] and CHF [congestive heart failure]." Accordingly, Mr. Eddy was required to take what is known as a "stress test." The certificate gave Mr. Eddy 45 days, until March 27, 2019, to obtain this testing and the accompanying documentation. Mr. Eddy promptly provided a copy of this paperwork to Mr. Cutting and Mr. Brinn, and explained that he needed to obtain a "stress test" to renew his MEC.

32. Due to his cardiologist's schedule, Mr. Eddy was not able to take the stress test until February 22, 2019. Mr. Eddy took the test on this date, satisfied the requirements, and received the accompanying documentation. Mr. Eddy obtained a valid MEC three days later on February 25, 2019.

33. After receiving his reissued MEC, Mr. Eddy went to the Virginia DMV to have his CDL reissued. While at the DMV, he discovered that his MEC had been incorrectly dated February 22, 2018 – about a year prior to the correct issue date. Mr. Eddy worked with the DMV to resolve the error, and eventually obtained a proper MEC dated February 26, 2019. That same day, the DMV cleared Mr. Eddy to receive a reissued, valid CDL.

34. After returning from the DMV, Dominion gave Mr. Eddy seven days to produce a physical copy of his CDL. Mr. Eddy received a temporary, paper copy of his CDL on March 6, 2019, and his physical CDL card three days later on March 9, 2019. Dominion permitted Mr. Eddy to return to work after he presented the temporary, paper copy of his CDL, and his suspension was lifted effective March 11, 2019.

35. From January 29, 2019 to March 11, 2019, Mr. Eddy repeatedly asked his supervisors, Warren Cutting and Brian Bell, if he would be permitted to "ride along" in a boom truck pending the reissuance of his MEC, and, consequently, his CDL. Both Mr. Bell and Mr. Cutting were aware that Mr. Eddy's MEC was pending subject to Mr. Eddy's ability to pass a stress test, which was related to his underlying heart condition. Moreover, such an accommodation would have permitted Mr. Eddy to continue performing the essential functions of his position. Indeed, as discussed in more detail below, Dominion frequently permitted employees with suspended CDL's to "ride along" in a boom truck. Despite this, Dominion refused to provide this accommodation to Mr. Eddy. Ultimately, Mr. Eddy was suspended from work, without pay, from on or around January 29, 2019 to March 11, 2019.

<u>Mr. Eddy is Treated Differently than His Non-Disabled Comparators</u>.

36. Dominion maintains a policy titled "Guidelines – Commercial Driver's License Suspension" ("CDL Suspension Policy"). This policy was in effect at the time of Mr. Eddy's suspension from work without pay in early 2019.

37. In pertinent part, the CDL Suspension Policy states:

> Management within Dominion Energy has the discretion to work with an employee in an effort to accommodate a temporary disqualification from operating a commercial motor vehicle where the disqualification lasts no longer than 14 months per accommodation.

38. Further, the CDL Suspension Policy provides a number of "decision points" to be

considered when determining whether an accommodation should be provided. These decision points include, but are not limited to, "[the] [r]eason for disqualification"; "[e]mployee's overall driving record"; and "[p]revious driving accommodations."

39. Lastly, the CDL Suspension Policy provides that "the Company [Dominion] maintains discretion and flexibility to respond to unique or unforeseen circumstances as it sees fit."

40. In accordance with the CDL Suspension Policy, Mr. Eddy promptly made Dominion management, namely Messrs. Bell and Cutting, aware of his temporary inability to operate a commercial motor vehicle.

41. Contrary to the CDL Suspension Policy, Dominion offered Mr. Eddy no accommodation during the temporary disqualification period, even though it lasted just six-weeks.

42. Specifically, Mr. Eddy was not permitted to ride in (but not drive) one or more of Dominion's commercial boom trucks pending the results of his medical testing, even though he repeatedly asked if he could do so. Instead, Dominion suspended Mr. Eddy, without pay.

43. Upon information and belief, a number of other Dominion employees were permitted to "ride along" in Dominion boom trucks while their CDLs were either temporarily suspended or lost, including but not limited to Tommy Imel, Lee Miles, Ricky Wilson, Joe Iousue, Dan McNally, Hunter Basnight, and Bruce Manly.

44. Upon information and belief, the aforementioned employees did not suffer from Mr. Eddy's cognitive heart failure, had not undergone a triple bypass surgery, did not suffer from Mr. Eddy's resulting physical limitations, and were not "disabled" within the meaning of the ADA. Significantly, these employees were not suspended without pay like Mr. Eddy.

<u>Mr. Eddy Develops Peripheral Neuropathy & Is Terminated</u>.

45. On or around March 28, 2019, Mr. Eddy was diagnosed with peripheral neuropathy, which caused him to suffer severe headaches, nausea, extreme fatigue, and numbness on the left side of his body. In order to alleviate these symptoms, Mr. Eddy's doctors prescribed him medication with side effects that included dizziness and lightheadedness, and which included warnings not to operate heavy machinery. Mr. Eddy informed his supervisors of his condition and, consequently, was temporarily unable to perform the duties of an Electric Serviceman, 1st Class.

46. Following his diagnosis, Mr. Eddy frequently communicated with his supervisors, Brian Bell and Warren Cutting, regarding his medical status and recovery. From May 2019 to August 2019, Mr. Eddy and Mr. Bell exchanged a number of text messages regarding Mr. Eddy's diagnosis and ability to return to work. On May 17, 2019, for example, Mr. Eddy informed Mr. Bell that his physician had ruled out a diagnosis of cancer or lymphoma, and that Mr. Eddy was setting up an appointment with a rheumatologist for additional testing. On May 28, 2019, in response to questions about when he would be able to return to work, Mr. Eddy asked Mr. Bell if his work absence and status could be addressed on a "week by week" basis, to which Mr. Bell responded that he would put Mr. Eddy out until "next week" and to keep him posted. As instructed, Mr. Eddy kept Mr. Bell informed about the status of his appointments, diagnosis, and ability to return to work. On July 1, 2019, Mr. Bell asked Mr. Eddy "how long do you want me to put you out for?," to which Mr. Eddy replied to "[s]tart another two weeks" and that he would have more information after his next appointment. The next day, Mr. Eddy told Mr. Bell that he had a follow-up in six weeks, to which Mr. Bell replied, "I'll put you out for 6 weeks and if something changes let me know." Thereafter, Mr. Eddy and Mr. Bell continued to correspond frequently about the

status of Mr. Eddy's diagnosis and recovery.

47. On July 1, 2019, Mr. Eddy attended an appointment with his primary care physician, Dr. Charles Marks. The notes from that appointment state, in pertinent part, that Mr. Eddy was "still having headaches," "has been told he may have a vasculitis," and that Mr. Eddy "sees neurology next week." Dr. Marks also notes that Mr. Eddy "may need to see rheumatology if pain persists." Importantly, Dr. Marks did not clear Mr. Eddy to return to work.

48. On August 16, 2019, Mr. Eddy received a letter from, Greg Boyce, Manager-Electric Distribution Operations, instructing Mr. Eddy to return to work by August 26, 2019 ("Return to Work Letter"). In the letter, Mr. Boyce stated "Dominion Energy was notified by your treating doctor on June 28, 2019 that you were cleared at that time to return to work without any medical restrictions or special accommodations."

49. Contrary to Dominion's representations, Mr. Eddy had not been cleared to return to work, as evidenced by the notes from his July 1, 2019 appointment with Dr. Marks.

50. After receiving the Return to Work Letter, Mr. Eddy submitted Dr. Marks contact information to both Michael Claytor, Human Resources, and Mr. Boyce to clear up the discrepancy between Dr. Marks actual diagnosis and Dominion's representation of Dr. Marks diagnosis. Mr. Boyce informed Mr. Eddy that Dominion's Medical Records Officer ("MRO"), Dr. Marc Flickinger, was trying to get ahold of Dr. Marks to assess Mr. Eddy's ability to return to work.

51. On August 23, 2019, Mr. Eddy sent a text message to Mr. Boyce stating "I have not heard anything since we last spoke other then MRO [Dr. Flickinger] was trying to get ahold of my dr. [Dr. Marks]. I was just curious where we stand? Am I to report Monday [August 26th]?" Mr. Boyce responded the same day, stating "Just hang tight until you hear from me. I'll be in touch Monday."

52. On Monday, August 26, 2019, Mr. Eddy sent Mr. Boyce three text messages asking for an update on whether he was required to report to work and the status of Dr. Flickinger's communications with Dr. Marks. For example, Mr. Eddy told Mr. Boyce "[a]pparently Dr. Marks is trying to contact MRO [Dr. Flickinger]..he [Dr. Marks] is back to work now..and is as confused about everything.." In response, Mr. Boyce said Mr. Eddy did not need to report to work the following day.

53. The following day, August 27, 2019, Mr. Boyce sent Mr. Eddy a text message stating "Just hang tight until you hear from me. Waiting for Dr. Flickinger to speak to your doctors."

54. On September 9, 2019, after Mr. Eddy continued to hear nothing from Dominion regarding his return to work, he sent Mr. Boyce a text message stating that Michael Claytor had "threatened his job" and that he had "heard nothing more from anyone." The same day, Mr. Boyce responded "we would like to get a release signed so Dr. Flickinger may speak to your I think your neurologist." Mr. Eddy promptly replied that he had not seen a neurologist, and that Dr. Marks should be the main point of contact. Mr. Eddy and Mr. Boyce texted back and forth along the same lines the rest of September 2019, with Mr. Eddy asking for updates, Mr. Boyce replying that he would try and get answers, and with little substantive information being provided to Mr. Eddy.

55. In late September 2019, after continuing to hear nothing from Mr. Boyce or others about the status of Dr. Flickinger's correspondence with Dr. Marks, or his other physicians, Mr. Eddy corresponded with Unum, Dominion's Long-Term Disability Benefits ("LTD") provider, regarding his eligibility to apply for and receive LTD benefits.

56. On October 3, 2019, Mr. Eddy contacted Norma Campbell, Dominion Human Resources, to inquire about his LTD eligibility. Importantly, Mr. Eddy did not complete an

application for such benefits and did not submit an application for such benefits.

57. On October 3, 2019, Neil Rozier, Director Electric Distribution, sent an email (the "Termination Email") to a Dominion employee named Charlene Whitfield with a letter attached, which Mr. Rozier described as "offer[ing] our recommendation to terminate Brian Eddy." The Termination Email represented that Mr. Eddy's "doctors have stated that he should have returned to work on June 28, 2019." The Rozier Email stated "Dr. Flickinger has contacted Brian's primary care physician [Dr. Marks] and the doctor states that he may return to work as of June 28, 2019." The Termination Email also stated, "Brian has submitted medical release forms from four other doctors, and they have all confirmed that Brian should return to work without restrictions."

58. At the end of the Termination Email was a section titled "Excerpts from notes that Dr. Flickinger put in the medical management log" followed by eight entries, organized in chronological order. Upon information and belief, these entries were drafted by Dr. Flickinger.

59. One of the entries identified the Termination Email, dated September 11, 2019, stated:

> Have called the Neurologist office and unfortunately, Dr. Qazizadeh has a medical emergency and will be out of the office for "weeks" according to office staff. They are going to see if a partner can talk with me but this now becomes much more challenging.

60. The next entry in the Termination Email, dated September 12, 2019, stated:

> Received a call back from Neurology office and no other Neurologist willing to make a decision on Brian as far as work status.

61. On October 14, 2019, Mr. Eddy received a letter from Greg Boyce stating: "due to your unavailability to work, your employment as an Electric Serviceman/1st Class Distribution Operations Chesapeake with Dominion Energy is hereby terminated effective October 11, 2019."

<u>Dominion Crafted a Pretextual Basis for Mr. Eddy's Termination</u>.

62. After his termination, Mr. Eddy filed a grievance with his union, which then obtained certain communications concerning the basis for his termination.

63. In one such email, dated March 2, 2020 (the "Claytor Email"), Michael Claytor, Dominion Human Resources, sent Anthony Sofia and others a "Summary of Dr. Flickinger's notes from system, summary as of 9/17/19." That email identified "Critical notes that Dr. Flickinger has put in the medical management log," followed by a series of eight entries, organized in chronological order.

64. Significantly, the eight entries in the Termination Email are identical to the eight entries in the Claytor Email, with one notable exception. In the Claytor Email, Dr. Flickinger's entry from September 12, 2019 states:

> Received a call back from Neurology office and no other Neurologist willing to make a decision on Brian as far as work status. *Dr. Q will be out of work several weeks according to the staff so now we have very little recourse because Dr. Marks was wanting Neurology opinion on work status*.

65. In the Termination Email, however, the italicized portion of the preceding excerpt is omitted entirely. In other words, the Termination Email, which represents that Dr. Marks had cleared Mr. Eddy to return to work, omitted a portion of Dr. Flickinger's September 12, 2019 entry stating that Dr. marks "was wanting Neurology opinion on work status."

66. After discovering this discrepancy, Mr. Eddy obtained a letter from Dr. Marks, who confirmed that "Mr. Eddy, who was fired from his job, was never declared by me that he was cured of his illness that he has had since his cardiac surgery." The letter continued: "I never released him to return to work saying he was cured of his current problems. At the time of his release from his job, he was still be referred to several specialist[s]."

67. Upon information and belief, the italicized portion of Dr. Flickinger's September

12, 2019 entry was intentionally omitted from the Termination Email for the purpose of manufacturing a pretextual basis for Mr. Eddy's termination, namely, that Mr. Eddy had been cleared to return to work, but refused to do so.

68. Upon information and belief, at the time of Mr. Eddy's termination, Dominion was aware that Mr. Eddy had not been cleared to return to work by his primary care physician, Dr. Marks, as the Termination Email inaccurately suggests.

69. Upon information and belief, Dominion terminated Mr. Eddy on grounds that it knew or should have known were inaccurate at the time of such termination.

## Count I – Failure to Accommodate in Violation of the ADA

70. Mr. Eddy incorporates the preceding paragraphs by reference.

71. At all times relevant, Mr. Eddy had an "actual disability" within the meaning of the ADA.

72. At all times relevant, Mr. Eddy was a "qualified individual" within the meaning of the ADA.

73. At all times relevant, Dominion was aware of Mr. Eddy's disabilities.

74. On several occasions in January and February 2019, Mr. Eddy asked Dominion for reasonable accommodations by (1) asking his supervisors to permit him to "ride along" in a boom truck pending the reissuance of his MEC subject to his completion of medical testing and (2) seeking accommodations from Norma Campbell that would alleviate the aches, chest pains, nausea, and other symptoms resulting from his underlying heart condition.

75. The accommodations Mr. Eddy requested would have allowed him to perform the essential functions of his position as an Electric Serviceman / 1st Class without imposing an undue hardship on Dominion.

76. Dominion did not provide Mr. Eddy the accommodations he requested.

77. Moreover, Dominion did not engage in a good faith interactive process to identify a suitable accommodation for Mr. Eddy.

78. Upon information and belief, Dominion does not maintain a policy governing reasonable accommodations of disabilities under the ADA, and did not maintain such a policy at the time Mr. Eddy requested such accommodations.

79. Upon information and belief, Dominion's acts were willful, knowing, intentional, and made in bad faith.

80. Mr. Eddy has been damaged as a result of Dominion's actions by, among other things, losing the income he would have received during his suspension from January 28, 2019 to March 11, 2019, which was the direct result of Dominion's refusal to permit him to ride along in a boom truck pending the results of his medical testing.

## Count II – Disparate Treatment in Violation of the ADA

81. Mr. Eddy incorporates the preceding paragraphs by reference.

82. At all times relevant, Mr. Eddy had an "actual disability" within the meaning of the ADA.

83. At all times relevant, Mr. Eddy was a "qualified individual" within the meaning of the ADA.

84. At all times relevant, Dominion was aware of Mr. Eddy's disabilities.

85. In the alternative, Mr. Eddy was a qualified individual who was "regarded as" disabled within the meaning of the ADA.

86. Dominion's CDL Suspension Policy grants its managers the discretion to provide accommodations to employees who are temporarily unable to operate a commercial motor vehicle.

87. One of the most common accommodations provided under the CDL Suspension Policy is to permit an employee to "ride along" in one or more of Dominion's commercial boom trucks while the employee is temporarily unable to operate such a vehicle himself or herself.

88. Dominion did not permit Mr. Eddy to "ride along" pursuant to the CDL Suspension Policy. Instead, he was suspended without pay.

89. By contrast, several non-disabled Dominion employees were permitted to ride along in Dominion's commercial boom trucks after their CDLs had been misplaced, suspended, or otherwise determined to be invalid.

90. The circumstances of Mr. Eddy's suspension and loss of pay suggest that Domination discriminated against him in the terms and conditions of his employment because of his disability.

91. Upon information and belief, Dominion's acts were willful, knowing, intentional, and made in bad faith.

92. Mr. Eddy has been damaged as a result of Dominion's actions by, among other things, losing the income he would have received during his suspension from January 28, 2019 to March 11, 2019, which was the direct result of Dominion's refusal to permit him to ride along in a boom truck pending the results of his medical testing.

<u>Count III – Wrongful Termination in Violation of the ADA</u>

93. Mr. Eddy incorporates the preceding paragraphs by reference.

94. At all times relevant, Mr. Eddy had an "actual disability" within the meaning of the ADA.

95. At all times relevant, Mr. Eddy was a "qualified individual" within the meaning of the ADA.

96. At all times relevant, Dominion was aware of Mr. Eddy's disabilities.

97. In the alternative, Mr. Eddy was a qualified individual who was "regarded as" disabled within the meaning of the ADA.

98. At the time of his termination, Mr. Eddy was performing his job at a level that met his employer's reasonable expectations.

99. The circumstances of Mr. Eddy's termination suggest that Domination discriminated against him in the terms and conditions of his employment because of his disability.

100. Upon information and belief, Dominion's acts were willful, knowing, intentional, and made in bad faith.

101. Mr. Eddy has suffered substantial monetary and non-monetary damages as a direct and proximate cause of Dominion's termination of his employment.

102. Upon information and belief, Dominion's acts were willful, knowing, intentional, and made in bad faith.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brian Eddy respectfully requests that the Court enter judgment against Defendant Dominion Energy, Inc. and award Mr. Eddy the following relief:

a. Order Dominion to immediately reinstate Mr. Eddy to his former position or, in the alternative, order Dominion to pay Mr. Eddy an appropriate amount of front pay;

b. Award Mr. Eddy back pay, including benefits;

c. Award Mr. Eddy compensatory damages in the maximum amount permitted by law;

d. Award Mr. Eddy punitive damages in the maximum amount permitted by law;

e. Award Mr. Eddy the costs, expenses, and attorney's fees incurred in bringing this action;

f. Award Mr. Eddy pre-judgment and post-judgment interest at the prevailing rates;

g. Grant all other relief to which Mr. Eddy may be entitled

## JURY TRIAL DEMAND

Plaintiff Brian Eddy demands a trial by jury on all triable issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 27, 2020

Respectfully submitted,

/s/
Aaron D. Siegrist (VSB No. 91072)
Joshua L. Jewett (VSB No. 76884)
PIERCE MCCOY, PLLC
101 West Main Street, Suite 101
Norfolk, Virginia 23510
Tel: (757) 286-2903
Fax: (757) 257-0387
asiegrist@piercemccoy.com
jjewett@piercemccoy.com

*Counsel for Plaintiff Brian Eddy*